IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| GATKEK BOL, | ) | 8:10CV48 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| FIRST DATA, Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

    This matter is before the court on Defendant's Motion for Summary Judgment. (Filing No. 19.) As set forth below, Defendant's Motion is granted and this matter is dismissed with prejudice.

## BACKGROUND

    Plaintiff Gatkek Bol ("Bol") filed his Complaint in this matter on February 4, 2010. (Filing No. 1.) The court conducted a detailed initial review of the Complaint and permitted Plaintiff to complete service of process on Defendant First Data Corporation ("First Data"), his prior employer. (Filing No. 6.) Liberally construed, Bol alleges that First Data discriminated against him because of his national origin in violation of Title VII of the Civil Rights Act of 1964. (Filing No. 1.) Defendant filed its Motion for Summary Judgment on August 23, 2010. (Filing No. 19.) In support of its Motion, First Data filed a Brief and an Index of Evidence. (Filing Nos. 20 and 21.) Bol did not respond to the Motion for Summary Judgment, despite having more than two months in which to do so. (*See* Docket Sheet.)

    The party seeking the entry of summary judgment in its favor must set forth "a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." NECivR 56.1(a)(1). If the non-moving party opposes the motion, that party

must "include in its [opposing] brief a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1). Such response must "address each numbered paragraph in the movant's statement" of facts and must contain pinpoint citations to evidence supporting the opposition. *Id.* "Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." *Id.*; *see also* Fed. R. Civ. P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.").

Defendant submitted a statement of material facts in accordance with the court's Local Rules. Further, Defendant submitted evidence which was properly authenticated by affidavit or sworn deposition testimony. Plaintiff did not respond to any of Defendant's submissions and, in particular, did not submit any evidence in opposition to Defendant's Motion.[1] (*See* Docket Sheet.) In light of this, Defendant's Motion is deemed fully submitted and the court adopts the following undisputed material facts, as set forth by Defendant.

### *RELEVANT UNDISPUTED FACTS*

1. Plaintiff began his employment with First Data in June 18, 2007, as an Insert Operator ("Operator").

---

[1]Approximately two months *before* Defendant filed its Motion for Summary Judgment, Bol filed two Letters. (Filing Nos. 16 and 18.) These Letters consist of restated allegations from the Complaint and unsupported arguments relating to Bol's allegations. They do not contain any evidence submitted in accordance with the Federal Rules of Civil Procedure or the court's Local Rules. As such, the court will not consider these Letters in conjunction with the pending Motion for Summary Judgment. However, even if the court did consider the Letters, the decision set forth below would not change.

2. Plaintiff was born in Sudan.

3. Plaintiff worked as an Operator in the Output Services Group ("Output Services"), Mail Services Administration Department located at 805 Crown Point Avenue, Omaha, Nebraska.

4. Plaintiff earned $10.70 per hour during his employment with First Data. First Data did not reduce Plaintiff's pay at any time during his employment, nor did Plaintiff ever receive a demotion or change in benefits.

5. Operators set-up, operate, monitor, and adjust various machines to meet the specifications of Output Services and its customers' requirements and expectations.

6. As an Operator, Plaintiff was responsible for ensuring the accuracy of each customer package that was prepared for mailing by completing various visual and quality inspections.

7. Jarven C. Warren ("Warren"), Output Services Supervisor, was one of Plaintiff's supervisors during his employment with First Data.

8. Operations Manager Linda Frederiksen ("Frederiksen") was Plaintiff's second line supervisor.

9. First Data had policies in place throughout Plaintiff's employment which prohibited discrimination and/or harassment and set forth a specific complaint procedure for employees to follow in the event they felt they were being discriminated against and/or harassed.

10. First Data also maintains and implements a Progressive Correction

Action process for employees who are not meeting performance standards.

11. The first step in the Progressive Corrective Action process is a Documented Consultation.

12. Phase I is the second step in First Data's Progressive Corrective Action process, and a Phase I is usually issued if an employee fails to correct the behavior identified in a Documented Consultation.

13. Phase II is a final written warning, and it constitutes the last step in First Data's Progressive Correction Action process.

14. Plaintiff was not issued a Phase I or a Phase II corrective action at any time during his employment with First Data.

15. Additionally, First Data had an Open Door Policy in place at all times during Plaintiff's employment that promoted two-way communication at all levels of the organization and encouraged employees to bring their problems or concerns to management and/or human resources for resolution.

16. The Progressive Correction Action process, policies regarding harassment and discrimination, and First Data's Open Door policy are contained in First Data's handbook.

17. Plaintiff reviewed the handbook containing these policies and signed an acknowledgment.

18. Operators begin their employment as Zone A Operators.

19. Operators are informed from the beginning, and throughout their first

year of employment, that they must be eligible for promotion to Zone B by their twelfth month of employment.

20. Eligibility for Zone B is based upon an Operator's ability to: (1) master all Zone A requirements; (2) achieve a "Meetings Standards" or higher rating on their last performance review; and (3) achieve a minimum production rating of seventy-five percent (75%) for two out of three consecutive months.

21. The current zone requirements for Zone A, Zone B, and Zone C have been in place since February 1, 2005.

22. While a seventy-five percent (75%) performance standard percentage is necessary for promotion to Zone B, employees in Zone A must meet and maintain a minimum sixty-five percent (65%) production standard each month.

23. An Operator's first 90 days of employment are considered training, and new Operators are not held to a production standard during that time.

24. When an Operator's machine malfunctions, they are allowed to place the machine on suspension.

25. An Operator's production standard percentage is unaffected when their machine is placed on suspension.

26. Plaintiff placed his machine on suspension when it malfunctioned.

27. At least two Sudanese employees with whom Plaintiff worked at First Data had their production standard percentages adjusted as a result of working on faulty machines.

28.     Plaintiff's training period ended on September 16, 2008.

29.     Plaintiff was off work on personal medical leave from November 29, 2007, to January 31, 2008.

30.     Upon returning to work from medical leave on January 31, 2008, Warren reminded Plaintiff of the production standard requirements that he needed to achieve to be considered performing satisfactorily.

31.     First Data credited Plaintiff with all of the time he spent off work on medical leave and added it to his one-year eligibility deadline for Zone B promotion, making his deadline to be eligible for Zone B August 2008.

32.     From June 2007, through May 2008, Plaintiff's production standard percentages were:  June 2007-13.35%, July 2007-27.52%, August 2007-39.02%, September 2007-31.67%, October 2007-57.56%, November 2007-59.54%, February 2008-51.32%, March 2008-53.88%, April 2008-59.67%, May 2008-48.74%.

33.     As a result of Plaintiff's failure to meet the sixty-five percent (65%) minimum production standards, Plaintiff received a Documented Consultation, the first step in First Data's Progressive Correction Acton process, from Warren on June 6, 2008.

34.     Warren informed Plaintiff on June 6, 2008, that the Documented Consultation would remain in effect until September 30, 2008.

35.     Warren also reminded Plaintiff that he needed to meet and maintain a seventy-five percent (75%) production standard for two out of three consecutive months to be considered as performing satisfactorily and to be eligible for promotion to Zone B.

36. Warren reiterated to Plaintiff that his failure to be promoted to Zone B by September 30, 2008, would result in further disciplinary actions, up to and including termination.

37. After the Documented Consultation, First Data assigned Team Production Leader Chuol C. Yiel ("Yiel") to provide Plaintiff with one-on-one coaching and training throughout his entire shift for one week.

38. Plaintiff achieved the seventy-five percent (75%) production standard after working with Yiel in June 2008.

39. In July 2008, Plaintiff's production was again below the minimum standard. Plaintiff's production standard percentages for June through August 2008, were: June 2008-76.27%, July 2008-52.31%, August 2008-64.61%.

40. Plaintiff's continued low percentages made him ineligible to be a Zone B Operator.

41. Plaintiff's continued low percentages did not even meet the sixty-five percent (65%) minimum standard requirements for a Zone A Operator.

42. During periods of increased workload, various departments at First Data may seek volunteers to perform temporary job assignments.

43. Plaintiff volunteered for temporary assignments as a Stager in the Staging Department on several occasions during his employment with First Data.

44. A Stager is a not a permanent job position, but rather a basic entry-level temporary assignment that can be performed by any employee capable of carrying, lifting and/or moving the required materials.

45. In late June 2008, First Data sought two or three volunteer Stagers to help handle an increased workload in the Staging Department.

46. Plaintiff volunteered for another temporary assignment as a Stager in the Staging Department.

47. Beginning July 3, 2008, Plaintiff was temporarily assigned to work as a Stager in the Staging Department, and he was scheduled to work in that capacity until the Staging Department's workload tapered off, at which time he would be reassigned to his permanent job position as an Operator in Output Services.

48. Team Production Operator I, Yohannes Tut ("Tut"), was assigned to provide Plaintiff with the training he needed to satisfactorily perform his temporary duties as a Stager.

49. After receiving a complaint from Tut regarding Plaintiff's unsatisfactory job performance in the Staging Department, which included the repeated delivery of inaccurate inventory and failure to listen and follow directions, First Data returned Plaintiff to his permanent job position in Output Services on July 25, 2008.

50. First Data never permanently transferred Plaintiff to a position in the Staging Department.

51. First Data offers employees the opportunity to work holidays at an increased rate of pay. In order to schedule employees for holiday shifts, First Data requires that employees desiring to work on the holiday submit a request. If there are more volunteers than needed for a given holiday shift, First Data management determines which of the volunteers will work the holiday shift based upon past performance and productivity. There is no guarantee that all employees volunteering for a holiday shift will be able to work on that holiday shift.

52. Plaintiff requested, and was selected, to work on Memorial Day 2008.

53. Plaintiff requested, but was not selected, to work on the July 4, 2008, holiday.

54. During the July 4, 2008, holiday shift, First Data selected some Sudanese employees to work.

55. When there is a vacancy in a department at the Crown Point Facility, First Data advertises its positions internally and externally.

56. If a current First Data employee applies for an advertised position, the individuals making the hiring decision for that position typically review any performance records for that employee.

57. Plaintiff applied for the vacant Team Production Operator I position in the Staging Department between July 25, 2008, and August 11, 2008.

58. Plaintiff was granted an interview for the vacant Team Production Operator I position in the Staging Department, but he was not hired for the position because he was not considered the most qualified applicant.

59. Plaintiff's poor work performance during his previous stint as a temporary employee in the Staging Department in July 2008, was one of the reasons Plaintiff was not hired for the vacant Team Production Operator I position in the Staging Department.

60. The individuals hired for the vacant positions were African-American and Sudanese.

61. The Team Production Operator I position would have been considered a demotion from Plaintiff's position as an Operator in Output Services, as the Team Production Operator I position had a lower hourly wage.

62. On August 11, 2008, Frederiksen met with Plaintiff.

63. During the August 11, 2008, meeting, Plaintiff stated he was resigning for personal reasons effective August 25, 2008.

64. Plaintiff made the decision to resign his employment with First Data voluntarily, and he did not receive advice from anyone to resign.

65. Plaintiff provided First Data with a written resignation letter on August 11, 2008, which he authored and signed.

66. Plaintiff's resignation letter stated "[t]he experience that I have here is so great and I will apply it whenever God wants me to do and I wish you all the best in life."

67. During the August 11, 2008, meeting, Frederiksen offered Plaintiff the option of resigning his employment immediately on August 11, 2008, and receiving two weeks of additional pay without having to work during his two week notice period.

68. Plaintiff accepted the offer on August 11, 2008, and he subsequently received two weeks of pay in lieu of working his two week notice period.

69. During the August 11, 2008, meeting, Plaintiff, like any other employee submitting a resignation, was given the opportunity to report any items related to his employment, positive or negative, but did not make any statements that he had been

treated unfavorably, harassed, and/or discriminated against.

70. During Plaintiff's employment, the only permanent position held by Plaintiff was the Zone A Operator position.

71. At least two Sudanese employees with whom Plaintiff worked at First Data were promoted from Zone A to Zone B.

72. At least two Sudanese employees with whom Plaintiff worked at First Data received training on high-speed machines.

73. Plaintiff spoke with Warren on several occasions about his employment at First Data, but he never complained to Warren that he was being harassed and/or discriminated against on the basis of his national origin.

74. Plaintiff spoke with Frederiksen on several occasions about his employment at First Data, but he never complained to Frederiksen that he was being harassed and/or discriminated against on the basis of his national origin.

(*See* Filing Nos. 20 and 21.)

### ANALYSIS

### I. *Summary Judgment Standard*

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). *See also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir. 1994). It is not the court's function to weigh evidence in the summary

11

judgment record to determine the truth of any factual issue. *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## II.     *Plaintiff's Title VII Claim*

Plaintiff claims that First Data subjected him to unfair treatment and harassment because of his national origin, Sudanese, in violation of Title VII of the Civil Rights Act of 1964. (Filing No. 1 at CM/ECF p. 1.) For the reasons stated below, Plaintiff's discrimination claim fails because Plaintiff has not set forth a prima facie case of discrimination.

### A.     Applicable Law

Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To survive a motion for

summary judgment, a plaintiff can demonstrate unlawful discrimination through either direct or indirect evidence. *Bearden v. Int'l Paper Co.*, 529 F.3d 828, 831 (8th Cir. 2008). Claims premised on indirect evidence are analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Because Plaintiff offers no evidence of direct discrimination, the court will analyze his claims under the *McDonnell Douglas* framework. Under this framework, Plaintiff bears the initial burden of proving a prima facie case of discrimination. *Id.* If Plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises and the burden shifts to the Defendant to articulate a legitimate nondiscriminatory reason for its employment decision. *Bearden,* 529 F.3d at 831. If the Defendant articulates a nondiscriminatory reason, the burden returns to the Plaintiff to show that the proffered reason is pretextual. *Id.* at 831-32 (citing *Brannum v. Missouri Dep't of Corr.*, 518 F.3d 542, 548 (8th Cir. 2008)). However, the ultimate burden of persuasion remains with the plaintiff throughout the case.

Summary judgment may be entered in a Title VII action "if any essential element of the *prima facie* case is not supported by *specific facts* sufficient to raise a genuine issue for trial." *Brower v. Runyon*, 178 F.3d 1002, 1005 (8th Cir. 1999) (emphasis added). Accordingly, to set forth a prima facie case, Plaintiff must establish that: (1) he is a member of a protected group; (2) he was qualified for his position; (3) he was discharged or otherwise suffered an adverse employment action; and (4) his discharge or the adverse employment action occurred in circumstances giving rise to an inference of discrimination. *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 857 (8th Cir. 2004); *Johnson v. AT & T Corp.*, 422 F.3d 756, 761 (8th Cir. 2005);

B.     Bol's Claim

13

Construing the evidence submitted by Defendant in a light most favorable to Plaintiff, the court finds that the undisputed evidence establishes only the first element of his prima facie case. As such, Plaintiff's Complaint must be dismissed in its entirety.

The undisputed evidence shows that First Data hired Bol to be a Zone A Operator. (Filing No. 21-3, Attach. 3, at CM/ECF p. 2.) To be qualified for the Operator position, and to be promoted to Zone B, First Data required Bol to maintain certain production standards. (Filing No. 21-4, Attach. 4, at CM/ECF p. 2.) In particular, First Data required Bol to maintain a 75% production rating for two out of three consecutive months in order to be promoted to Zone B, and to maintain a 65% production rating to keep his Zone A position. (*Id.* at CM/ECF p. 2.) First Data also required Bol to progress to a Zone B Operator within 12 months of being hired. (*Id.* at CM/ECF pp. 2-3.) These production rates are not affected by faulty machines, and Bol was not penalized in any way for a faulty machine, nor was Bol penalized for taking a medical leave. (*Id.* at CM/ECF p. 3; Filing No. 21-3, Attach. 3, at CM/ECF p. 3.) First Data informed Bol of these production requirements upon his hiring, and reminded him of these requirements when Bol returned from an extensive medical leave. (Filing No. 21-3, Attach. 3, at CM/ECF p. 2.) During his first 10 months of employment, Bol failed to meet his production standards in every single month. (*Id.*) At that time, First Data provided Bol with additional and intensive one-on-one training, and he met the production standards for a short period of time. (Filing No. 21-4, Attach. 4, at CM/ECF pp. 4-5.) However, after one month, Bol again dropped below the acceptable production standards. Bol applied for another job within First Data, but was not hired due to, among other reasons, his poor work performance. (Filing No. 21-1, Attach. 1, at CM/ECF p. 3.)

The undisputed evidence also shows that, on August 11, 2008, Bol resigned his position at First Data due to "personal reasons." (Filing No. 21-2, Attach. 2, at CM/ECF pp. 4-5.) On that date, Bol submitted a letter which noted that he had a

great experience working at First Data. (Filing No. 21-11, Attach. 11, at CM/ECF p. 1.) At no time did Bol report any harassment or adverse treatment to any of his supervisors. (Filing Nos. 21-1, Attach. 1, at CM/ECF p. 3; 21-3, Attach. 3, at CM/ECF p. 3; 21-4, Attach. 4, at CM/ECF p. 7.) Thus, the undisputed evidence before the court shows that Bol voluntarily resigned his position at First Data and was not terminated.[2] Further, there is no evidence before the court that Bol's national origin figured into his job assignments or training in any way. The evidence before the court instead shows that Bol failed to meet work performance standards throughout his employment at First Data, was given extensive training to remedy that failure, and later voluntarily resigned his position for undisclosed personal reasons. In short, although Bol is a member of a protected class, there is absolutely no evidence before the court showing that Bol was qualified for his position, was discharged or suffered any other adverse change in employment, or that any circumstances existed giving rise to an inference of discrimination. In light of the undisputed facts, Bol has failed to establish the requisite elements of his prima facie case and this matter is therefore dismissed.

IT IS THEREFORE ORDERED that:

1. Defendant's Motion for Summary Judgment (filing no. 19) is granted. All claims against Defendant are dismissed with prejudice.

2. A separate judgment will be entered in accordance with this Memorandum and Order.

---

[2]There is nothing before the court indicating that Plaintiff was subject to a "constructive discharge." See *Tatum v. City of Berkeley*, 408 F.3d 543, 551 (8th Cir. 2005) ("A constructive discharge occurs when an employee resigns after the employer has created an intolerable working environment in a deliberate attempt to compel such a resignation.")

3.      The Final Pretrial Conference, scheduled for December 15, 2010, at 9:00 a.m., is cancelled.  The Clerk of the court is directed to provide a copy of this Memorandum and Order to Magistrate Judge Zwart.

DATED this 18th day of November, 2010.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.